## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NASIR A. SHAH,

      *Plaintiff*,

  v.

VINAYAK SAXENA,

      *Defendant*.

Civil Action No. 23-3127 (TJK)

## <u>MEMORANDUM OPINION</u>

Nasir Shah hired Vinayak Saxena to represent him in connection with a potential real-estate investment for Shah's business. But Shah claims that the deal turned out to be fraudulent, and his business lost all the money it invested. So in July 2023, he sued Saxena for legal malpractice and breach of contract in the Superior Court of the District of Columbia. A few months later, Saxena removed the case to this Court on the basis of diversity jurisdiction.

Since then, two developments have cast doubt on whether the Court may exercise such subject-matter jurisdiction. First, Shah moved to remand the case to Superior Court, arguing that he was a citizen of Maryland at the time he filed suit—despite conceding that he had moved to Virginia by then—so he was not diverse from Saxena. Although he has since withdrawn that motion and purported to "concede" that subject-matter jurisdiction is proper, the Court has an independent obligation to ensure that the parties are diverse such that it may exercise diversity jurisdiction. Second, Saxena moved to dismiss, arguing that Shah lacks standing to sue to remedy harms suffered by his business. If he is right, then the amount in controversy does not meet the diversity-jurisdiction threshold of more than $75,000.

The Court agrees with Saxena that he and Shah are diverse and that Shah lacks standing to

vindicate harms *his company* suffered. But in advancing the latter argument, Saxena has shown—perhaps unwittingly—that the amount in controversy is below the jurisdictional threshold, thereby depriving the Court of diversity jurisdiction. Thus, Saxena has failed to show that diversity jurisdiction is proper. And since the Court must remand a removed case when it lacks subject-matter jurisdiction, the Court will, on its own motion, remand the case to Superior Court.

## I.    Background

### A.    Factual Background

Shah owns and operates Shah Investment Group LLC ("Shah Investment"), a Virginia limited liability company through which he makes real-estate investments. ECF No. 2-3 ¶ 11; ECF No. 11-2 at 2.[1] Shah alleges that, in July 2020, he "was virtually introduced to Coloma River Holdings LLC ("Coloma River") and Charles Paret . . . through an email about the opportunity to purchase some real property" in Washington, D.C. ECF No. 2-3 ¶¶ 8–9. That same day, Coloma River allegedly sent Shah two documents, in which 4910 Georgia Ave Holdings LLC (together with Coloma River and Paret, "the Developers") offered to sell several yet-to-be-built condominiums to Shah Investment. *Id.* ¶¶ 9, 11. Shah was apparently receptive to the deal, and the Developers allegedly "emailed their lawyer saying that" Shah Investment "was going to bring in funds" for the "purchase of units in the building." *Id.* ¶¶ 12–13. They then "forwarded this email to Shah and informed him that Coloma River owned the offered properties and, once Shah or his company provide[d] proof of funds and sign[ed] a non-disclosure agreement, the encumbrances on the [p]roperty would be released." *Id.* ¶ 15. Two days later, the Developers sent more purchase documents to Shah, again listing Shah Investment as the intended buyer. *Id.* ¶ 16.

---

[1] "The Court may take judicial notice of information posted on official public websites of government agencies." *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022).

But Shah was concerned because of the encumbrances on the property and because the condos were not yet built.  ECF No. 2-3 ¶ 19.  To allay those concerns, he contacted Saxena on July 26, 2020, asking him to "write" a "contract for [Shah]" regarding the deal.  *Id.* ¶ 22.  The two then "met up . . . in public at a bier garden . . . to discuss Shah's potential purchase of the [p]roperty and Shah's concerns in that regard."  *Id.* ¶¶ 23–24.  And the next day, Saxena allegedly "had Shah meet with him at Saxena's father's house," where "Shah gave Saxena $6,000 in cash to," among other things, "write the contract for the purchase of the [p]roperty," "determine any title concerns," and further negotiate the deal with the Developers.  *Id.* ¶¶ 27–29.

Shah alleges that Saxena failed to uphold his end of the bargain.  He claims that, even though he "hired Saxena to rewrite" the contract between Shah and the Developers "to ensure that the transaction would occur free of encumbrances and other defects," "Saxena only made minor revisions."  ECF No. 2-3 ¶¶ 39–41.  And those revisions caused problems.  *Id.* ¶ 42.  For example, Saxena allegedly changed the name of the buyer from the correct name, "Shah Investment Group LLC," to "Shah Investments LLC," which does not exist.  *Id.* ¶¶ 43, 56.  Despite these alleged flaws, Shah "rel[ied] on Saxena's word" that he "performed the due diligence for which [he] was hired," so Shah "proceeded with the" deal by "provid[ing] the $545,000 in funds owed under" the agreement with the Developers.  *Id.* ¶¶ 45, 49.

On July 31, 2020, Shah and the Developers closed the deal.  ECF No. 2-3 ¶¶ 50–51.  But following closing, Saxena allegedly "failed to take any steps to make sure that Shah's interest in the [p]roperty was recorded."  *Id.* ¶ 60.  So the Developers purportedly "record[ed] an interest on the [p]roperty before Shah recorded his interest."  *Id.* ¶ 62.  Then they "foreclosed upon the [p]roperty," leaving Shah "with nothing."  *Id.*  And according to Shah, this was always what the Developers intended.  Shah alleges that, from the beginning, the Developers' offer was "a sham, and the

[p]roperty was never intended to actually be conveyed to Shah." *Id.* ¶ 10. Indeed, the entire affair was a complicated ruse "to trick Shah into handing over funds for the purchase in exchange for receiving nothing in return." *Id.* Yet even after the foreclosure, Shah alleges that "Saxena had Shah pay him another $10,000 to acquire the recorded title to the [p]roperty," which he failed to do. *Id.* ¶ 64.

### B.    Procedural Background

On July 28, 2023, Shah, in his individual capacity, sued Saxena in the Superior Court of the District of Columbia, asserting one claim of legal malpractice and one claim of breach of contract. ECF No. 2 ¶ 1; ECF No. 2-3 ¶¶ 75–112. He alleged that his "residence" was in Maryland, as was Saxena's. ECF No. 2-3 ¶¶ 2–3. Saxena, alleging that Shah instead resided in Virginia, removed the case, asserting diversity jurisdiction. ECF No. 2 ¶¶ 5–9. Soon after, Shah moved to remand, claiming that "no diversity of citizen [sic] exists," because even though he had "recently" moved to Virginia, he "never intended to make Virginia his permanent residence," so his domicile remained in Maryland. ECF No. 10-1 at 1. Though Shah has since withdrawn his motion to remand, purporting to "concede" that the Court has subject-matter jurisdiction, the Court noted that parties "cannot 'concede' subject-matter jurisdiction, as this Court has an independent obligation to satisfy itself of its own jurisdiction." Min. Order of Sept. 13, 2024. So it held a hearing to receive testimony and evidence on the issue of Shah's citizenship.

While this dispute was ongoing, Saxena also moved to dismiss the case. ECF No. 11. In his motion, Saxena argues that the Court should dismiss Shah's claims "with prejudice," mainly because Shah has failed to plausibly plead that he has standing. *Id.* at 1. He also argues that the Court should dismiss Shah's claims for attorneys' fees and punitive damages. ECF No. 11-1 at 10–11. Shah opposes in all respects. ECF No. 13.

## II.    Legal Standard

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Yet when a plaintiff brings suit in a state court, the defendant may "remove[]" the case to federal court if the district court would have had "original jurisdiction" over the case had it been originally filed in federal court. 28 U.S.C. § 1441(a). "The party that removed the action 'bears the burden of proving that jurisdiction exists in federal court.'" *Travelers United, Inc. v. Hyatt Hotels Corp.*, 761 F. Supp. 3d 97, 109 (D.D.C. 2025) (quoting *Steele v. Salb*, 681 F. Supp. 2d 34, 36 (D.D.C. 2010)).

Saxena removed this case based on diversity jurisdiction. Federal courts have diversity jurisdiction when the parties are diverse and "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a). But even if those requirements are met, for a court to have jurisdiction, plaintiffs must also have standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341–42 (2006). Plaintiffs have standing when they have "suffer[ed] an 'injury in fact' that is both 'concrete and particularized' and either 'actual or imminent'" that was caused by a defendant's actions and is redressable by a favorable court ruling. *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). And standing is party specific: a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

In assessing its jurisdiction at the pleading stage, the Court must accept as true all the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, but the Court need not "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001). That said,

the Court "may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000). Jurisdictional facts must be proven to a preponderance of the evidence. *LaBotz v. FEC*, 889 F. Supp. 2d 51, 59 (D.D.C. 2012). And when a case has been removed to federal court, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded." 28 U.S.C. § 1447(c) (emphasis added).

## III.    Analysis

In his motion to dismiss, Saxena argues that the Court should dismiss this case because Shah failed to allege that he suffered an injury in fact, meaning he lacks standing. The Court agrees that Shah did not personally or directly suffer most of the economic injuries he is suing to remedy. Specifically, because Shah Investment, not Shah himself, lost the $545,000 involved in the allegedly fraudulent real-estate transaction, Shah lacks standing to sue to remedy that loss. And even assuming Shah has standing to sue to recover the remaining $16,000 he seeks in his complaint, without the $545,000, Shah's claims do not exceed the jurisdictionally required amount in controversy. So even though Shah and Saxena are diverse, the Court lacks subject-matter jurisdiction, and it must remand the case. *See* 28 U.S.C. § 1447(c).

### A.    The Court Lacks Diversity Jurisdiction

Saxena removed this case based on diversity jurisdiction. ECF No. 2 ¶¶ 5–9; 28 U.S.C. § 1332. So he has the burden to prove, as relevant here, that he and Shah are "citizens of different States" and that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." § 1332(a), (a)(1). The Court concludes that Saxena has shown, to a preponderance of the evidence, that he and Shah are citizens of different states. But because Saxena has not established that the jurisdictional amount-in-controversy requirement is met, the Court lacks

subject-matter jurisdiction.

### 1.    Shah and Saxena Were Diverse at the Time of Filing and Removal

In determining citizenship for purposes of diversity jurisdiction, "the relevant evidence is that relating to the domiciles of the parties." *Prakash v. Am. Univ.*, 727 F.2d 1174, 1180 (D.C. Cir. 1984). That is, a party is a citizen of the state in which he is domiciled. "Domicile is determined by two factors: physical presence in a state, and intent to remain there for an unspecified or indefinite period of time." *Id.* Moreover, in determining citizenship, it must "appear[] affirmatively in the petition for removal, or elsewhere in the record, that at the commencement of the action"—here, July 28, 2023, ECF No. 2 ¶ 1—"as well as when the removal was asked"—October 18, 2023, ECF No. 2 at 3—the parties were citizens of different states. *Stevens v. Nichols*, 130 U.S. 230, 231 (1889). The parties do not dispute that Saxena is, and at all relevant times has been, a citizen of Maryland. They also do not dispute that, about a year and a half before he sued in July 2023, Shah moved from Maryland back to a Virginia property he bought in 2010 and in which he had lived before. And they do not dispute that, at the time of the evidentiary hearing, he intended to remain in Virginia indefinitely. Thus, whether the parties are citizens of different states turns on whether, at the relevant times—July and October 2023—Shah intended to remain in Virginia indefinitely, which he denies. *See* ECF No. 14 at 6–7.

In assessing a party's intent to remain in a state, courts undertake a fact-intensive inquiry. In so doing, they consider, among other things, "current residence, a sworn declaration of domicile, voting registration, home ownership, ownership of personal property, automobile registration, a driver's license, bank accounts, and club membership." *Lopes v. JetsetDC, LLC*, 4 F. Supp. 3d 238, 241 (D.D.C. 2014). Based on the record before it, including testimony and other evidence introduced at the evidentiary hearing, the Court concludes that Saxena has shown that, since at

least the beginning of 2023, Shah had the requisite "intent to remain" in Virginia "for an unspecified or indefinite period of time." *Prakash*, 727 F.2d at 1180.

To begin, Shah testified at the evidentiary hearing that, from 2010 to July 2018, he lived in Virginia at a property he owned. He then moved to a property he owned in Maryland, but in about December 2021 or January 2022—three to four months before he sold his Maryland property in April 2022 and a year and half before he sued in July 2023—he moved back to his Virginia property, which he had never sold. He testified that he did so because his children didn't like the schools in Maryland. He has lived at his Virginia residence ever since. Of course, residency at the relevant times alone is "not determinative" of domicile or an intent to remain, but it is "indicative" of such. *Naegele v. Albers*, 355 F. Supp. 2d 129, 134–35 (D.D.C. 2005).

Shah's actions after moving back to Virginia also suggest that he established an intent to remain there well before he sued in July 2023. In December 2021 or January 2022, he brought his family with him to Virginia, and his children have attended school there since then. His credit card bills, at least since October 2022, reflect his Virginia address. Ex. 2. Indeed, Shah testified that he had never even changed them to reflect his Maryland address. Since 2022, Shah has filed state tax returns for Virginia and not Maryland. Ex. 3. Similarly, he listed his Virginia address on his 2022 federal tax returns. *Id.* Although Shah's driver's license and voter registration are still tied to his former Maryland address, on balance, these factors suggest an intent to remain in Virginia. Shah, "like, presumably, many individuals who have moved from one state to another state—has merely failed to change his driver's license" and voter registration. *Lopes v. JetSetDC, LLC*, 70 F. Supp. 3d 555, 559 (D.D.C. 2014). Such "minimal connections," without more, do not "warrant the finding" that Shah is domiciled in Maryland. *See Jankovic v. Int'l Crisis Grp.*, No. 4-cv-1198, 2005 WL 3276227, at *5 (D.D.C. Aug. 23, 2005).

Still, Shah testified that he did not develop an intent to remain in Virginia indefinitely until the end of 2023—somewhat conveniently, *after* he sued. He said that his move to Virginia in December 2021 or January 2022 was, in his mind, only temporary at first. To that end, he started searching online for a new place to live in Maryland right away, although he never visited any properties for sale. But he testified that he stopped searching about five or six months after his move back to Virginia—so in about May or June 2022. And there is no evidence he ever took any other action suggesting he was preparing or intending to move from Virginia back to Maryland or to anywhere else.

Based on the facts set forth above and upon consideration of the entire record, including the Court's observation of Shah's testimony, to the extent that Shah testified that he had not developed an intent to remain in Virginia by the beginning of 2023, the Court does not find his testimony credible. By that point, Shah had returned to his Virginia residence for about a year. His children were in school during that time. He had stopped looking for residences to buy in Maryland about six months beforehand and had never restarted them. And he paid his 2022 taxes solely in Virginia. Ex. 3. On top of all that, Shah's inaccurate allegation in his July 2023 complaint that he was an individual "whose residence is in Maryland," ECF No. 2-3 ¶ 2—when he had not resided there for a year and a half—suggests gamesmanship to avoid diversity jurisdiction.

For these reasons, the Court concludes that Saxena has met his burden of showing to a preponderance of the evidence that, at least by the beginning of 2023, Shah had an intent to remain in Virginia indefinitely, and so he had become a citizen of Virginia. Thus, the Court has no trouble finding that by July 2023, with his online searches for a Maryland residence dormant for a year and his children heading into another year of school there, Shah was a citizen of Virginia. Thus, because Shah was a Virginia citizen when he filed his complaint—and in October 2023 when

9

Saxena removed the case—the parties were diverse as required for diversity jurisdiction under § 1332.

### 2.    The Amount in Controversy Does Not Exceed $75,000

But diversity is only half the equation.  Saxena must also show that "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs."  28 U.S.C. § 1332(a).  Unfortunately for him, his motion to dismiss does the opposite.  In it, he argues that Shah lacks standing.  The Court agrees, at least to the extent Shah is trying to sue to recover the $545,000 lost in the fraudulent deal with the Developers, which removes that sum from the amount in controversy.  And without that amount, Shah's claims do not meet the threshold.

To remove a case to federal court, the removing defendant "must file in the federal forum a notice of removal 'containing a short and plain statement'" supporting removal.  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) (quoting 28 U.S.C. § 1446(a)).  Saxena alleged in his notice of removal that "the amount in controversy exceeds $75,000."  ECF No. 2 ¶ 7.  Ordinarily, "when a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted."  *Dart Cherokee Basin Operating Co., LLC*, 574 U.S. at 87.  But courts are not powerless to police this jurisdictional requirement.  Instead, the amount-in-controversy allegation included in "a defendant's notice of removal" must be "plausible."  *Id.* at 89. So "if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed," the Court lacks jurisdiction.  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938).  And like with other jurisdictional matters, the Court may sua sponte address the plausibility of a defendant's amount-in-controversy allegation.  *Sloan v. Soul Circus, Inc.*, No.15-cv-1389, 2015 WL 9272838, at *4 n.4 (D.D.C. Dec. 18, 2015).

As relevant here, a sum is not properly included in the amount in controversy when the plaintiff lacks standing to sue for that sum. *Bronner v. Duggan* (*Bronner I*), 364 F. Supp. 3d 9, 17 (D.D.C. 2019), *aff'd sub nom. Bronner ex rel. Am. Stud. Ass'n v. Duggan* (*Bronner II*), 962 F.3d 596 (D.C. Cir. 2020); *see also Bronner II*, 962 F.3d at 607–09. When a plaintiff lacks standing to seek damages for some amount, "it appears to a legal certainty that" the plaintiff cannot recover for that amount. *Bronner I*, 364 F. Supp. 3d at 17, 21; *Bronner II*, 962 F.3d at 609. So in evaluating the amount in controversy in a removal case, the Court must assess whether it is plausible that the plaintiff has standing to sue for an amount more than $75,000. But here, Saxena persuasively argues that Shah *lacks* standing to sue to recover the money lost by his company in the allegedly fraudulent real-estate transaction. And the remaining claimed damages do not reach the jurisdictional amount.

### a. Because Shah Lacks Standing to Sue to Recover the Lost $545,000, That Amount Is Not Included in the Amount in Controversy

In his motion, Saxena first argues that Shah lacks standing to recover the $545,000 lost in the allegedly fraudulent real-estate transaction because that injury was suffered by Shah Investment, not Shah himself. The Court agrees. And because Shah lacks standing to vindicate that injury, that amount is not in controversy. And without it, Shah's claims do not exceed $75,000.

To begin, the Court returns to the peculiar procedural posture in which this issue arises. Saxena, as the removing party, bears the burden to show that the Court has subject-matter jurisdiction over this suit. *Travelers United, Inc.*, 761 F. Supp. 3d at 109 (quotation omitted). That requires *Saxena* to show, among other things, that Shah has standing and that his claims reach the jurisdictional threshold. *Id.* Yet in arguing that Shah has not suffered an injury sufficient to confer standing to sue over the $545,000, Saxena has effectively conceded that the Court lacks jurisdiction over a claim for that sum. And as explained below, without that $545,000, the jurisdictional

amount-in-controversy requirement is not met. Even though parties may not concede that a Court *has* subject-matter jurisdiction, "arguments *in favor* of subject matter jurisdiction can be waived by inattention or deliberate choice." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) (emphasis added). Thus, Saxena has effectively waived the argument that the $545,000 can play a role in establishing the jurisdictional amount—and, consequently, he has conceded that the Court lacks jurisdiction. A straightforward application of these principles requires the Court to find that Saxena has not established subject-matter jurisdiction and remand the case, full stop.

But even putting the issue of waiver aside, the Court agrees with Saxena that Shah lacks standing to sue to recover the $545,000 lost to the Developers' fraud. Because Shah has alleged that Shah Investment, not Shah himself, suffered that injury, he lacks standing to sue to remedy that loss.

The principles governing Saxena's standing argument come from the "shareholder standing" doctrine, a "longstanding equitable restriction" that prevents shareholders from "su[ing] to enforce corporate rights except in limited circumstances." *Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 76 (D.D.C. 2009) (quoting *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336 (1990)). Though sometimes referred to as an equitable or prudential limit on a court's jurisdiction, the doctrine also has constitutional underpinnings, since "plaintiffs must demonstrate Article III standing by asserting their own legal rights and interests rather than resting claims to relief on the legal rights or interests of third parties." *Bronner I*, 364 F. Supp. 3d at 18 (cleaned up), *see also Bronner II*, 962 F.3d at 607. In other words, the shareholder-standing doctrine bars members of a business from suing to redress harms to that business rather than "injuries they have suffered personally." *Bronner II*, 962 F.3d at 607. And though the name of the doctrine may imply that only corporations are covered by this rule, it applies with equal force to limited

liability companies like Shah Investment.  *E.g.*, *Heyer v. Schwartz & Assocs. PLLC*, 319 F. Supp. 3d 299, 304–05 (D.D.C. 2018).

Shah has plausibly alleged that only Shah Investment has standing to sue over the lost $545,000 because his allegations show that only Shah Investment—not he—was directly injured by the Developer's alleged fraud.  He alleges, for example, that the very first documents he received from the Developers "offered" to sell the condominium units "to Shah's company, 'Shah Investment Group LLC.'"  ECF No. 2-3 ¶ 11.  And in their internal emails, the Developers noted that "'Shah Investment Group LLC' was going to bring in funds for a pre-sale agreement for certain properties."  *Id.* ¶ 12.  The second round of documents similarly "specified" that the "Buyer" was "Shah Investment Group LLC."  *Id.* ¶ 16.  Shah also alleges that Saxena committed malpractice by "chang[ing] the name of the buyer" in the real-estate contract from "the correct name of Shah's company[] to the incorrect name of 'Shah Investments LLC.'"  *Id.* ¶ 43.  All this accords with the allegations that Shah makes in his related case against the Developers: "Shah Investment Group LLC is a limited liability company incorporated in Virginia, *which was used by Shah* in the purchase of the three condo units to be located on the subject property."  Complaint ¶ 2, *Shah v. DP Cap. LLC*, No. 23-cv-1102 (D.D.C. Sept. 6, 2023), ECF No. 35. (emphasis added) (cleaned up).  In the end, in his briefing Shah never disputes the fundamental point that Shah Investment—not Shah himself—contracted to buy the condos.  Thus, because Shah Investment was the buyer directly harmed by the Developers' fraud, Shah lacks standing to personally sue to remedy that injury.  *Bronner II*, 962 F.3d at 607.[2]

----

[2] Shah's allegations that Saxena committed malpractice by not listing "Shah or his company" as the buyer, ECF No. 2-3 ¶¶ 56, 101, are not to the contrary.  Again, Shah does not dispute that in the end, he purchased the condos through his company.

Shah responds by arguing that: (1) Rule 12(b)(1) does not "permit for a dismissal" for "lack of standing," ECF No. 13 at 9; (2) because Shah personally entered into an attorney-client (and contractual) relationship with Saxena, he has standing to sue to remedy harms stemming from Saxena's alleged malpractice and breach of contract, *id.* at 10–11; and (3) Shah suffered a direct financial injury because he "was the one who paid for the [p]roperty," *id.* at 11.  None of these arguments solves his problem.

First, Shah's Rule 12 argument can be quickly rejected.  Rule 12(b)(1) permits a party to move to dismiss a case for "lack of subject-matter jurisdiction," and standing is a prerequisite for subject-matter jurisdiction under Article III.  Fed. R. Civ. P. 12(b)(1); *Lujan*, 504 U.S. at 559–62. So Saxena's argument that Shah lacks standing to sue to remedy this injury neatly falls within Rule 12(b)(1)'s purview.  In any event, the Court must act on its own to determine whether to remand this case to Superior Court.  Though Saxena does not dispute the amount in controversy, the Court has an independent obligation to satisfy itself that the requirement is met.  *Sloan*, 2015 WL 9272838, at *4 n.4.  And as Saxena's standing arguments bear on that question, *Bronner I*, 364 F. Supp. 3d at 17, 21, the Court must consider them.

Second, the nature of Shah's claims against Saxena—malpractice and breach of contract— do not render the shareholder-standing doctrine inapplicable.  The D.C. Circuit has held in a similar context that the shareholder-standing doctrine still bars plaintiff-shareholders from suing to re-cover damages they suffered indirectly, even when they have a direct attorney-client relationship with a defendant attorney for the corporation.  In *Williams v. Mordkofsky*, for example, the Circuit addressed a case in which the plaintiffs, shareholders of two companies (Intermountain and Utah Telecourier, Inc. ("UTI")), sued UTI's corporate counsel, Mordkofsky, for malpractice after Mord-kofsky allegedly caused the Federal Communications Commission to deny a license application

that Intermountain had submitted.  901 F.2d 158, 160–61 (D.C. Cir. 1990).  The Circuit assumed

that Intermountain was the intended beneficiary of Mordkofsky's representation of UTI and that

Mordkofsky had a direct attorney-client relationship with the plaintiff-shareholders.  *Id.* at 163–

64.  Still, it held that the plaintiff-shareholders could not sue Mordkofsky because the "business

opportunity" that Intermountain lost—the license application—"belonged to Intermountain."  *Id.*

at 164.  The "losses" the plaintiffs suffered as shareholders based on the denial of that license,

therefore, "were derivative" of the harms inflicted on Intermountain, and they could not individu-

ally sue to remedy those losses.  *Id.*

    So too here.  As discussed, the allegations in the complaint establish that Shah Investment

was the intended buyer of the condos.  That is, Shah "chose to" engage in this transaction "through"

his business entity, Shah Investment.  *Williams*, 901 F.2d at 164; *see also* Complaint ¶ 2, *Shah*,

No. 23-cv-1102, ECF No. 35.  Therefore, the "business opportunity"—the supposed sale—"be-

longed to" Shah Investment.  *Williams*, 901 F.2d at 164.  So, at least insofar as the $545,000 is

concerned, Shah's losses stemming from that fraudulent sale "were derivative," such that he has

"failed to allege" that he suffered a "cognizable . . . injury *as* [*an*] *individual*[]."  *Id.*  And for that

reason, the shareholder-standing rule bars suit to recover these funds, even though Shah and

Saxena had a direct attorney-client relationship and the causes of action are for malpractice and

breach of contract.  *See id.* at 159, 164.

    Third, that Shah "provided the $545,000 in funds" does not mean he has standing to recover

those funds, even if he supplied them from a personal bank account.  ECF No. 2-3 ¶ 49.  If a

corporate shareholder or member of a limited liability company could defeat the shareholder-

standing rule merely by arguing that he furnished the money that the business lost in an underlying

transaction, that rule would be a dead letter.  Often, a business's funds or capital are supplied by

its members themselves.  *E.g.* Va. Code Ann. § 13.1-1027 (outlining how "a member to a limited liability company" may make "contributions" to the limited liability company in, among other things, "cash").  But in Virginia, where Shah Investment was formed, standing to sue is determined based on the party that suffered the injury, not the one that footed the bill.[3]  *See Gott v. Baker*, 31 Va. Cir. 371, 1993 WL 13030346, at *4 (1993).  Thus, for example, when a breach of contract forces a corporation to use a shareholder's "earned income" to offset "additional expenses incurred *by the corporation*[]" because of the breach, the shareholder cannot sue because "the expenses were incurred and losses sustained *by the corporation*."  *Id.*  Even though the shareholder may have lost his financial interest in what would otherwise have been his "earned income," that loss was suffered "only indirectly."  *Id.*  In those cases, a shareholder "may not sue in [his] own right" to vindicate the business's injury because he "do[es] not have standing to sue for corporate damages."  *Id.*

For these reasons, it does not matter that Shah put up the $545,000.  He can only claim that he was injured by that amount because he alleges that the Developers defrauded his company, and his financial losses stemmed from that transaction.  Thus, with regard to this sum, he has not "identif[ied] a legal interest that has been directly or independently harmed, i.e., a 'special injury' that does not derive from the injury to the corporation."  *Harpole Architects, P.C.*, 668 F. Supp. 2d at 77 (quoting *Labovitz v. Wash. Times Corp.*, 172 F.3d 897, 901 (D.C. Cir. 1999)).[4]

---

[3] "To determine if a 'shareholder's claims are derivative of the corporation's claims for standing purposes' and thus barred by the shareholder standing rule, courts 'apply the law of the state of incorporation.'" *Harpole Architects, P.C.*, 668 F. Supp. 2d at 76 (quoting *Termorio S.A., E.S.P. v. Electrificadora Del Atlantico S.A., E.S.P.*, 421 F. Supp. 2d 87, 92 (D.D.C. 2006)).

[4] As *Williams* demonstrates, that Saxena owed a duty to Shah personally as his attorney is not enough to get around the shareholder-standing rule.  901 F.2d at 164.

Finally, that Shah is the sole member of his company or that he was the only person funding his enterprise does not change this conclusion.  The rules governing "an LLC do not change merely because the LLC has only one member."  *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 357 (Va. 2019).  Had the circumstances been reversed and *Shah* failed to furnish the promised sum, he would have been entitled to use the company's legal protections to safeguard his personal funds.  *See Williams*, 901 F.2d at 164 ("Had Intermountain declared bankruptcy, it is certain that the Williamses would not be so quick to request that we disregard the corporate form.").  Shah, like all limited liability company members, must take the bitter with the sweet.

For all these reasons, because any injury suffered by Shah from the loss of the $545,000 is derivative of the harm suffered by Shah Investment, Shah lacks standing to sue to remedy that loss.

### b.      Shah's Remaining Claims for Damages Do Not Satisfy the Amount-in-Controversy Requirement

Because Shah lacks standing to sue for the recovery of the lost $545,000, that sum may not be included in the amount in controversy.  *Bronner I*, 364 F. Supp. 3d at 17, 21; *Bronner II*, 962 F.3d at 609.  So the Court must next consider whether Saxena has plausibly alleged that the remaining claimed sums exceed the $75,000 jurisdictional requirement.  They do not.

In his notice of removal, Saxena alleges that the amount-in-controversy requirement is met by pointing to paragraphs 88 and 112 of Shah's complaint.  ECF No. 2 ¶ 7; *see also* ECF No. 2-3 ¶¶ 88, 112.  In those paragraphs, Shah alleges that he is entitled to $561,000 in compensatory damages: $545,000 from the allegedly fraudulent deal, $6,000 from Shah's initial payment to Saxena, and $10,000 from the payment Shah made to have Saxena "acquire the recorded title to the" condo units.  ECF No. 2-3 ¶¶ 88, 112; *see also id.* ¶¶ 28, 63–64.  For the reasons discussed

above, the Court must discount the $545,000. That leaves only $16,000, well below the jurisdictional threshold.[5]

That said, Shah also seeks "interest, punitive damages at the statutory maximum, and attorneys' fees." ECF No. 2-3 at 14. While the calculation of the amount in controversy is "exclusive of interest," 28 U.S.C. § 1332(a), punitive damages and attorneys' fees may, in some cases, push the amount in controversy over $75,000. *See Breakman v. AOL LLC*, 545 F. Supp. 2d 96, 106–08 (D.D.C. 2008). But neither does the trick here.

To begin, Saxena does not include any mention of fees or punitive damages in his notice of removal or purport to rely on them in alleging the amount in controversy, much less give a good-faith estimate of the possible fees or punitive damages at stake. *See* ECF No. 2 ¶ 7. And courts routinely refuse to include amounts in their jurisdictional calculations when parties with the burden to prove jurisdiction "have provided no evidence" or even a plausible allegation that fees or damages, "if awarded, would equal more than" the jurisdictional amount. *Bronner I*, 364 F. Supp. 3d at 22 n.13. That alone would justify excluding fees and punitive damages from the Court's consideration. And that conclusion is even stronger here, where Saxena himself argues that such fees and damages are legally unavailable. ECF No. 11-1 at 10–11.

At any rate, for attorneys' fees to be included in the amount in controversy, they must be "provided for by statute or contract." *Info. Strategies, Inc. v. Dumosch*, 13 F. Supp. 3d 135, 144 (D.D.C. 2014) (quotation omitted). Neither Shah nor Saxena has identified any statute or

---

[5] Though Saxena's motion to dismiss could be read as arguing that Shah lacks standing to sue for this sum as well, the Court need not resolve this question. As explained below, even if Shah does have standing to recover everything but the $545,000, the amount-in-controversy requirement is not met, and the Court still lacks jurisdiction.

contractual provision authorizing attorneys' fees for malpractice or breach of contract.[6]  Instead, Shah points only to a common-law rule that permits "clients who have been forced into litigation by their attorney's malpractice" to seek fees.  *Dalo v. Kivitz*, 596 A.2d 35, 37 (D.C. 1991).  Even assuming a common-law rule—rather than a statute or contract—could permit the Court to include potential fees in its calculation of the amount in controversy, this exception does not apply here. Under the case law Shah identifies, fees can be sought only when the plaintiff "incurred the fees in the course of *prior* litigation."  *Id.*  (emphasis added).  So it does not permit fees in every mal-practice suit, as Shah seems to believe, nor does it allow a court to grant fees incurred during the *instant* litigation.  Instead, it is a way to recoup fees paid during prior litigation that the plaintiff should have never had to pay in the first place.  *Id.*  As there is no prior litigation here, this rule— and Shah's requested fees—do not count toward the jurisdictional amount in controversy.

As for punitive damages, "[l]iberal pleading rules are not a license for [parties] to shoehorn essentially local actions into federal court through extravagant . . . punitive damage claims." *Bronner II*, 962 F.3d at 611 (second alteration in original) (quoting *Kahal v. J.W. Wilson & Assocs., Inc.*, 673 F.2d 547, 549 (D.C. Cir. 1982)).  So "'[c]lose scrutiny' is necessary" where federal

---

[6] Though Shah points out that 28 U.S.C. § 1447(c) authorizes attorneys' fees, potential fees under that statute cannot be considered in the amount in controversy.  Instead, the fees must be authorized by "a contract in issue or by a statute *in controversy*."  *Srour v. Barnes*, 670 F. Supp. 18, 22 n.3 (D.D.C. 1987) (emphasis added).  If the fees are "collateral to the substantive matter in controversy," then they are not properly considered part of the amount in controversy.  *Id.* at 22. And here, fees under § 1447(c)—going to the propriety of removal—would be collateral to the "substantive matter in controversy"—Saxena's alleged malpractice and negligence.  *Id.*  At least as applied to § 1447(c), that makes sense.  For a court to have jurisdiction over a removed case, the complaint must be one that could have been originally filed in federal court.  *Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019).  And if this case had been filed in federal court in the first instance, it could not have been removed, and § 1447(c)'s fee provision would have no role to play.  So it cannot factor into the amount-in-controversy calculation.  What's more, Shah has withdrawn his motion for fees under § 1447(c), even further undercutting their applicability. ECF No. 10-1 at 10–12; ECF No. 19.

jurisdiction is lacking absent a substantial award for punitive damages. *Id.* (alteration in original) (quoting *Kahal*, 673 F.2d at 549).

Here, it is speculative whether an award of punitive damages would be so large as to bump the amount in controversy from $16,000 to over $75,000. Neither Shah nor Saxena explains why or how a jury could conclude that a punitive-damages award nearly quadruple the amount of the claimed compensatory damages is appropriate. And when the amount of punitive damages "is 'completely speculative' and 'factually unsupported,'" that amount "should not be included in determining the amount in controversy." *Sloan*, 2015 WL 9272838, at *10 (quoting *Wexler v. United Air Lines, Inc.*, 496 F. Supp. 2d 150, 154–55 (D.D.C. 2007)). Furthermore, as "the only allegation related to punitive damages in the complaint is the inclusion of an unquantified request in the catchall damage demand," that "vague allegation does not give [Shah's] claims for punitive damages a colorable basis in law and is insufficient to meet [Saxena's] burden to establish jurisdiction." *G. Keys PC/Logis NP v. Pope*, 630 F. Supp. 2d 13, 17 (D.D.C. 2009) (internal quotation marks and citation omitted).

For these reasons, Saxena has not met his burden of showing that the amount in controversy in this suit is over $75,000, as required for the Court to exercise diversity jurisdiction.

**B.    Because the Court Lacks Subject-Matter Jurisdiction, It Must Remand the Case to Superior Court**

Because the Court lacks subject-matter jurisdiction, it must remand the case to Superior Court. Though the general rule is that the Court should dismiss a case when it lacks jurisdiction, that rule does not apply in the removal context. Instead, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case *shall* be remanded." 28 U.S.C. § 1447(c) (emphasis added). Still, Saxena asks the Court to dismiss Shah's claims "with prejudice." ECF No. 11-1 at 2. Although he moves to dismiss for lack of subject-matter

jurisdiction, Saxena does not once even mention—much less grapple with—§ 1447(c)'s statutory command.  Because "it appears that" the Court "lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).

## IV.    Conclusion

For all these reasons, the Court will, on its own motion, remand the case.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: July 7, 2025